Exhibit "A"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------------------------X

CHAMPIONS LEAGUE, INC. AND
CHAMPIONS LEAGUE PARTNERS, INC.,

                             Plaintiffs,

       against-

BIG3 BASKETBALL, LLC,

                         Defendant.

------------------------------------------------------------------------------X

Index #:

Plaintiff designates New York
County as the place of trial

## Summons

The basis of venue is Plaintiff's
Principal Business Address

To the above named Defendant

      You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' Attorney within 20  days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       September 1, 2017

                            By: _____
                                Wesley J. Paul Esq.
                                902 Broadway, 6th Floor
                                New York, New York 10010
                                (646) 202-2532
                                Attorney for Plaintiffs

TO:    BIG3 BASKETBALL, LLC
        Corporation Service Company
        251 Little Falls Drive
        Wilmington, DE 19808
        (302)-636-5401

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.

—————————————————————

CHAMPIONS LEAGUE, INC. AND
CHAMPIONS LEAGUE PARTNERS, INC.,

*Plaintiffs,*

against-

**VERIFIED COMPLAINT**

BIG3 BASKETBALL, LLC,

*Defendant.*

—————————————————————

       Plaintiffs by its attorney, Wesley J. Paul, Esq., with an office at 902 Broadway, 6th Floor, New York, New York 10010, complaining of the Defendant, states to the Court and alleges as follows:

## PARTIES

1. At all times hereinafter mentioned, the plaintiff, Champions League, Inc. is, was and remains a New York Corporation, organized and existing under the laws of the State of New York, with its principal place of business at 630 5th Avenue, New York, New York 10111.

2. At all times hereinafter mentioned, the plaintiff, Champions League Partners, Inc., is was and remains a New York Corporation, organized and existing under the laws of the State of New York, with its principal place of business at 630 5th Avenue, New York, New York 10111.

3. Upon information and belief, defendant Big3 Basketball, LLC (hereinafter the "BIG3") was and is a limited liability company organized under the laws of the State of Delaware. The BIG3 has conducted substantial business activities in the State of New York.

4. Upon information and belief, defendant Big3 Basketball, LLC was and is a Delaware limited liability company authorized to do business in the State of New York.

## BACKGROUND

5. Champions League, Inc. is a corporation formed under the laws of the State of New York. CLI was formed in the year 2014. Champions League, Inc.'s wholly-owned subsidiary is Champions Basketball League, LLC which was set up to provide operational support to Champions League, Inc. in the business of developing, marketing, operating and providing support services relating to a newly-formed professional basketball league. As used in this Complaint, Champions League, Inc. and Champions Basketball League, LLC are collectively defined as "CBL."

6. CBL aims to provide high-quality, family-oriented basketball entertainment to sports fans at an affordable price.

7. CBL was formed by Carl George. Mr. George was originally trained as a software engineer and he also has an extensive business and entrepreneurial background. Mr. George has formed and sold several companies and also founded various private equity ventures with investments in diverse industries including software, biotech, real estate and energy.

8. CBL was formed out of Mr. George's recognition of certain gross inefficiencies in the market for professional basketball players.

9. In the United States, most professional basketball players aspire to play in the National Basketball Association ("NBA").

10. Mr. George recognized that a significant amount of talented players in the NBA who were essentially pushed out of the league each year in order to make room for new

players, for salary cap reason, or simply for arbitrary reasons not necessarily associated with skill. Most, if not all, of these players continued to have the requisite skill level and other attributes necessary to continue to play basketball at a high level if they so chose.

11. Mr. George also recognized that being a former player in the NBA should have special recognition that the existing market for the services of professional basketball players did not appear to recognize or appropriately reward. Mr. George recognized that in most professions, having achieved a particularly high level usually carries with it a permanence of status such as graduating from a prestigious university or obtaining a high academic degree, but that such lasting reward appeared to be lacking when it came to former NBA players.

12. For the majority of former NBA players, player salaries drop dramatically in most cases, in many cases to near zero. Such former NBA players essentially become unemployed after being dropped by NBA teams.

13. Like the recognition that the public and employers often bestow to employees with high academic or work achievements, sports fans generally also recognize the time, effort and achievement that former NBA players have obtained. Mr. George believes that sports fans will continue to recognize that value of having played in the NBA will have after players leave the NBA. In particular, certain former NBA players would have particular on-going value, such as former NBA players who were named as "All-Stars" or who had particularly recognized talents. Mr. George envisioned that the CBL would include a number of particularly prominent former NBA players, and that such players would be positioned in various cities in as part of the new league that would maximize such player's exposure and help ensure overall competitive balance among the CBL teams.

14. Accordingly, Mr. George set out to create a new league, the CBL, that is centered around the concepts of providing high value basketball for low cost. Moreover, Mr. George focused on developing an overall league structure that would bring unprecedented post-player exposure and opportunities for players even after their respective playing days. In order to facilitate and assist players with the transition as a player to a league employee, Mr. George hired various persons with knowledge of NBA or sports team/league operations with a view of creating special off-season training programs for players that are designed for the purpose of providing interested players with the skills necessary to transition to the league office or various team front offices.

15. The structure that Mr. George created included, without limitation, running CBL-led training camps for children of various ages and levels, cooperating with local educational and community enhancement organizations (such as Big Brothers/Big Sisters), organizing charitable 3 on 3 tournaments, providing inspirational and morale-enhancing activities for the U.S. armed forces, running overseas clinics and exhibitions (particularly in China), and co-venturing with musical and other celebrities for overall product enhancement.

16. Mr. George developed his vision and model for CBL over the course of three years from 2011 to 2014. Mr. George expended hundreds of thousands of dollars of his own money in order to research the creation of a new basketball league and the myriad of complex issues associated with the formation of CBL.

17. During the course of the preparation for the formation of the CBL, Mr. George developed detailed business plans, business projections, financial forecasts and other proprietary

material that he used and adapted in various business presentations to potential investors after the formation of CBL.

18. Starting in 2014 following the formation of CBL, Mr. George, as the CEO and CBL proceeded to develop further his vision of creating the new basketball league. In this regard, Mr. George was successful in raising over $2 million in connection with private, Regulation D (Rule 506) funds from a number of accredited investors.

19. The overall formation of the league headed by the CBL followed a very precise and carefully designed path to help ensure the long term viability of the CBL.

20. This path included: signing players to play for the CBL when the league launched; developing and forming the league and team ownership structures; obtaining television and media partners; structuring ownership structures to include fan participation.

21. A new entity, Champions League Partners, Inc. ("CLP") was formed for the purpose of initially holding interests in the various team entities that were contemplated as part of the new league. CLP operates as a separate entity from CBL.

22. CLP would acquire and hold team interests for income and appreciation.

23. Separate and apart from CBL, CLP also raised funds. CBL raised approximately $4 million in connection with private, Regulation D (Rule 506) funds from a number of accredited investors.

24. CBL also developed an innovative program for fans in the new league to become true owners commonly referred to as the SuperFAN program.

25. The SuperFan program took advantage of a new development in the federal securities laws which allowed for expedited and more efficient processes in marketing and selling public securities. This program is generally known as "crowdfunding". One specific set

of regulations adopted by the Securities and Exchange Commission was Regulation CF, which generally permits entities to raise up to $1 million in a "fast-track" basis from the public through approved portals.

26. The first team that was formed and sold under the new league is the Gotham Ballers. The Gotham Ballers is based out of New York City and the Gotham Ballers is operated and owned by an entity named Gotham Ballers, Inc., a New York entity.

27. The Gotham Ballers commenced a Regulation CF offering to the public through its investment portal in January 2017 and ending in April 2017. The Gotham Ballers raised approximately $605,000 from over 1,700 investors.

28. At all private fundraising events and follow up functions, investors in the private offerings were informed that information shared relating to the CBL or CLP was confidential and that on-going participation in the private offering would indicate such investor's agreement to keep such information confidential.

29. During the entire fundraising process, the CBL continued to hold events and exhibitions designed to promote the new league. These events included holding player camps and exhibition games involving players and personnel who were slated to be part of the new basketball league. For the majority of such events, potential investors were all invited to attend such events. These events were held at various times throughout 2015 and 2016.

30. Also during the entire fundraising process from the inception of CBL in 2014, the CBL began and continued the process of signing players for the new league. By mid-2016, over 140 players had signed contracts with the CBL.

31. Players who signed with the CBL were generally signed to substantially similar contracts.

32. An extensive process was developed to assign players to particular teams. This process took into account the player's history with a particular team location so that if a player achieved particular fame in a particular city that had a CBL team, that player would generally be assigned to that market.

33. All CBL player contracts were not limited to a specified term and obligated players to report and play with their designated teams once the league provided notice of the commencement of the league and/or once the league scheduled a game involving such player's designated team.

34. Since the CBL was expressly formed with the intention of enhancing player opportunities both inside the CBL format as well as outside, the league did not wish to limit players from playing on other professional basketball venues that did not directly compete, provided that such players be available once the CBL provided adequate notice of the commencement of the league.

35. On or around December 2016, another basketball venture started operations. This basketball operation is commonly known as the "BIG3".

36. Upon information and belief, the founders of the BIG3 are Ice Cube (legal name is believed to be Oshea Jackson), and Jeff Kwatinetz announced their intention to form a "new" basketball league that focuses on what is commonly referred to as "3 on 3" basketball. CBL focuses more on the traditional "5 on 5" basketball, where each team has five players on the court during the playing time.

37. Upon information and belief, during 2014 and 2015, business associates and acquaintances of Mr. Cube and Mr. Kwatinetz attended one or more investor presentations given by CBL as part of CBL's efforts to raise money and promote the

CBL. Upon information and belief, business associates of Mr. Cube or Mr. Kwatinetz were aware of the CBL's expansion and ancillary projects which included promotional basketball activities involving 3 on 3 basketball games involving former NBA players.

38. Mr. Cube indicated in various news reports that he obtained his idea to have a 3 on 3 basketball league after Kobe Bryant's 60 point game in April 2016 (which was Mr. Bryant's last professional NBA game before retirement).

39. Upon information and belief, the BIG3 started approaching various potential players in December 2016, many of whom already signed contracts with the CBL. At this same time, players (and in some cases player's agents who also had relationships with the BIG3) who already signed contracts with CBL also informed the CBL of the BIG3's activities. Many of CBL's players indicated that it was their intention and belief that the BIG3's activities will not prohibit players from participating in CBL's activities. The CBL was informed that the BIG3 will reach out to the CBL and further discuss arrangements so that an agreement can be made.

40. On or around February 16, 2017, Mr. Kwatinetz had a detailed call with Mr. George. The main focus of the call would be to discuss and coordinate schedules so that players could participate in both the BIG3 as well as the CBL. Mr. George was happy to engage in such discussions on behalf of the CBL and CLP because he saw the potential for a "win/win" situation whereby each party could benefit from the cross-marketing activities of the other.

41. As a result of such call, the BIG3 and CBL agreed to the following: (a) BIG3 basketball activities would be limited to 3 on 3 basketball and that players' agreements would reflect that they could not play in any other 3 on 3 league; (b) both the BIG3 and CBL would

allow players to participate in both leagues and that CBL would move its games to Tuesday, Wednesday and Thursday so that players could play in the long format Big3 on weekends and have time to recover; (c) in the case that there is a conflict with respect to any specific player, the BIG3 and CBL agreed to separately discuss on a case-by-case basis so that both the BIG3 and the CBL can help maximize player utilization and exposure. Mr. Kwatinetz indicated that he would have his attorneys reconfirm the agreements in writing, but that the agreements achieved on the phone call would nevertheless be binding.

42. During such call, it was also made clear to the CBL that the BIG3 wanted to announce its commencement first because the BIG3 involved a simpler operation and the CBL and CLP was still in the process of finalizing team sales by the time the BIG3 was scheduled to commence in June 2017. On the basis of the agreements entered into on the February 16, 2017 phone call, the CBL agreed that the BIG3 would move initially to start up its league and that the CBL and CLP would focus more on team sale activities.

43. The agreements obtained between the CBL and the BIG3 were entirely consistent with one of the CBL's main goals which was to provide qualified former NBA players with maximum opportunities during their post-NBA player careers.

44. During the call with Mr. Kwatinetz, Mr. George also informed generally of the status of CBL, the number of players signed by the CBL, and mentioned several signed players by name.

45. Throughout the spring, the BIG3 began to rapidly and significantly increasing marketing and promotion efforts and player signings to the Big3, including the signing of 22 players who were already signed to the CBL.

46. In May and June of 2017, the BIG3 held its tryouts, draft and initial games. The first games for the BIG3 were held on June 26, 2017 at the Barclays Center in Brooklyn, New York.

47. Incidentally, Mr. George also communicated with Mr. Kwatinetz that the CBL had previously had hosted events at the Barclays Center and Mr. George provided Mr. Kwatinetz with courtesy input, suggestions and contacts going forward on how the BIG3 may wish to proceed in booking the Barclays Center for BIG3 events.

48. Unknown to CBL at the time, the BIG3's real intent was to sign these players and then prevent their playing in the CBL's summer games.

49. Primarily in deference and in abidance with the CBL's agreements with the BIG3, the CBL delayed its launch until the late summer 2017 so that the BIG3 season would be largely completed.

50. In July of 2017, the CBL began notifying its players that the league was going to commence and to be prepared to play as required under the CBL player contracts.

51. To CBL's surprise, players slated to participate in the CBL's inaugural game on August 23, 2017 informed the CBL that they would be unable to participate due to threats made by the BIG3. Specifically, such players indicated that the BIG3 had asserted that the player agreements prohibited participation in the CBL league for the August 23 game and that any player participating in with the CBL would be found in violation of the BIG3 contract and rules and subsequently significantly fined and/or kicked out of the BIG3.

52. When the CBL discovered from its players the stance that the BIG3 was taking with respect to the CBL's inaugural game, the CBL immediately tried to contact the BIG3

through repeated calls to Amy Trask, Big3's CEO.  All calls or attempts to contact the BIG3 by the CBL were not returned.

53. Several players who were playing for the BIG3 and who also had existing contracts with the CBL told the CBL that they were told when they signed with the Big3 initially that the BIG3 only restricted participation in other 3 on 3 basketball events.  Such players also indicated their belief that their contracts do not actually restrict them from playing in the CBL but that the threat from the Big3 could cost them their position and their participation in the 52% of revenues promised by the Big3 as a season ending bonus pool.

54. In order to field teams for the CBL's inaugural game, the CBL initially modified rosters so that the August 23, 2017 (the replacement rosters) game could proceed as planned. In total 8 (80%) of the CBL'S starting 10 players on the New York and Los Angeles rosters were affected by this blocking from the Big3.  However, the CBL elected not to proceed with the game due to the strong adverse reaction it received to playing with replacement rosters from its lead team owners, SuperFan Owners, fans, and the media and the continued uncertainty relating to the threats being made by the BIG3 against players signed by the CBL.

55. Upon information and belief, when certain players expressed their desire to participate in the CBL games, Mr. Cube confronted the players personally about playing in the CBL and threatened the players that they would be fined, not allowed to participate in the 52% of revenues bonus pool or replaced on their teams. These threats were also shared with the CBL.

56. The BIG3 was aware that it signed at least 20 players who also signed contracts with the CBL.  The BIG3 was also aware of the most important and salient aspects of the CBL

player contracts as a result of its prior discussions with the CBL as well as the participation by the BIG3 founders (or their agents) in various investor meetings held by the CBL during 2014, 2015 and 2016. The BIG3 was also aware that the CBL had already signed at least 140 players in 2015 and 2016 which was almost two years before the BIG3 commenced the BIG3's games. As a result of the BIG3's actions in preventing CBL signed players from participating in the CBL's inaugural game on August 23, 2017 and the ongoing threat to players, the CBL suffered significant harm due to the BIG3's tortious interference with the business activities of the CBL and the CLP.

57. Also as a result of the BIG3's actions in preventing CBL signed players from participating in the CBL's inaugural game on August 23, 2017 and the ongoing threat to players, the BIG3 violated the terms of the agreement it entered into with the CBL, thus causing damage and harm to the CBL and CLP as a result of such breach.

58. The BIG3 obtained proprietary information belonging to the CBL and CLP. Proprietary information includes: (a) the identities of players signed by CBL; (b) the business plan of CBL including the CBL's strategies for obtaining suitable players and for future growth; (c) the development of ancillary support services for players to enhance job skills and future employment after retirement from playing; (d) the structure of the league and the team holding companies; (e) the future expansion projects of the CBL. It appears that a majority of the players who entered into agreements with the BIG3 had previously signed agreements with the CBL in 2015 or 2016. It also appears that agents for the founders (or the founders themselves) of the BIG3 were aware of CBL's operational plans that were provided on a confidential basis only to potential investors in CBL or CLP during the private financing rounds. It even appears that the idea of 3 on 3 tournaments was likely

derived from CBL's activities.  Nearly a year before the BIG3 announced its 3 on 3

league, the CBL hosted a "Heroes 3 on 3" tournament on February 20, 2016 in order to

honor veterans and was a well-publicized event (see video link

https://www.youtube.com/watch?v=r_jpWWa-zOA&feature=youtu.be). By the BIG3's

actions and misappropriation of proprietary information belonging to CBL and CLP,

significant damage has been done to the CBL and CLP.

59. The facts stated above indicate that the breaches caused by the BIG3 were willful,

intentional and made at the time the original agreements commenced between the CBL

and the BIG3.  The facts further indicate that the BIG3 attempted to enter into these

agreements as a means to procure a competitive advantage over the CBL and to induce

the CBL to a false sense of security and cooperation.  Accordingly, the BIG3 fraudulently

induced the CBL into agreements that were upheld by CBL, but never intended to be

honored by the BIG3.

60. By virtue of the BIG3's breach which is continuing, the BIG3 continues to be unjustly

enriched by the improper restrictions the BIG3 appears to continue to try and enforce

against players who had previously executed contracts with the CBL.


### AS AND FOR A FIRST CAUSE OF ACTION FOR

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

61. Plaintiff restates and realleges paragraphs 1 through 60.

62. To sustain a claim for tortious interference with contract there must have been a valid

contract with a third party, that the defendant intentionally induced the third party to

breach its contract with the Plaintiff, that the third party did breach its contract, and that

the third party would not have breached its contract with Plaintiff absent Defendant' conduct. <u>White Plains Coat & Apron Co., Inc. v Cintas Corp.</u>, 8 NY3d 422, 426 [2007].

63. Starting from 2014, CBL has signed players to contracts for its new league.

64. These "player contracts," are valid and enforceable contracts between individual players and the league. A sample of such player contract is attached as <u>Exhibit 1</u>.

65. The player contracts allowed for players to commit to other basketball playing opportunities so long as the players were available during the CBL season.

66. On or around February 16, 2017, Mr. Kwatinetz and Mr. George had a phone call that discussed, among other things, the number of players contractually signed by the CBL, and included the names of several specific players. Thus, Mr. Kwatinetz had actual knowledge of the player contracts with the CBL.

67. Following the phone call on February 16, and unknown to CBL at the time, the Big3 started to sign players to highly restrictive contracts that prohibited the Big3 players from participating in CBL games, thus forcing these players to break their contracts with CBL.

68. In late July early August 2017, when CBL notified and requested that the players to be prepared for the opening CBL game, CBL learned that the BIG3 had restricted these players from playing for the CBL and had also personally threatened the players if they did so. This directly affected 8 of the 10 starters planned for the game between the NY and LA teams.

69. Due to Defendant's intentional conduct, Plaintiffs' have suffered damages in loss of value, lost profits and other damages in an amount not less than $100 million.

## AS AND FOR A SECOND CAUSE OF ACTION FOR

### PROMISSORY ESTOPPEL

70. Plaintiff restates and realleges paragraphs 1 through 69.

71. In order for a party to bring a claim for promissory estoppel, the party must allege that there was a promise that is sufficiently clear and unambiguous, the party reasonably relied upon the promise and that reliance caused injury to the party. Schroeder v. Pinterest Inc., 133 AD 3d 12 - NY: Appellate Div., 1st Dept. 2015.

72. On February 16, 2017, Mr. Kwatinetz and Mr. George had a phone call whereby they agreed that (a) BIG3 basketball activities would be limited to 3 on 3 basketball; (b) both the BIG3 and CBL would use their commercially reasonable best efforts to coordinate schedules to allow players to participate in both basketball activities; (c) in the case that there is a conflict with respect to any specific player, the BIG3 and CBL agreed to separately discuss on a case-by-case basis so that both the BIG3 and the CBL can help maximize player utilization and exposure, in accordance with the player's wishes  (the "February 2017 Agreements").

73. As a result of this oral agreement, the Plaintiffs relied upon BIG3's promise to permit CBL signed players to also engage in other basketball-related activities so long as these players would be available to play for CBL when the season started.

74. The Big3 then reneged on the agreement stated in paragraph 72, threatening these players if they played for the CBL. The Plaintiffs reliance on BIG3's promise has caused injury to the Plaintiffs because these signed players were unable to play for the CBL.

75. Due to Defendant's breach of its promises, Plaintiffs' have suffered damages.

## AS AND FOR A THIRD CAUSE OF ACTION FOR

## BREACH OF CONTRACT

76. Plaintiff restates and realleges paragraphs 1 through 75.

77. The following elements must be plead on a breach of contract claim: 1) a valid and enforceable contract; 2) the plaintiff's performance of the contract; 3) breach by the defendant; and 4) damages.

78. The February 2017 Agreements between CBL and the BIG3 constituted a legal, valid and binding contract under the laws of the State of New York.

79. CBL provided good and valuable consideration to the BIG3 by (a) agreeing to delay commencement of the CBL season to largely avoid overlap with the BIG3 season and (b) minimize disruption to the BIG3 season, among other good and valuable consideration.

80. The BIG3 agreed to, among other things, that its basketball activities would be strictly limited to 3 on 3 basketball and that the BIG3 would not limit any of the BIG3 players from participating in the CBL 5 on 5 basketball league, provided that CBL upheld its agreements during the BIG3 season.

81. CBL and CLP fully abided by and completed any and all obligations under the February 2016 Agreements.

82. When the CBL league season was announced to begin, the BIG3 refused to allow "its" players to participate despite such players already being bound by previously executed agreements.  The BIG3 threatened such players with penalties, sanctions and other forms of punishment.

83. By so doing, the BIG3 breached the terms and the intent of the February 2016 Agreements, thereby causing CBL and CLP damages in an amount not less than $100 million.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## MISAPPROPRIATION OF PROPRIETARY INFORMATION

84. Plaintiff restates and realleges paragraphs 1 through 83.

85. To establish misappropriation of proprietary information, plaintiffs must allege that "it possessed a trade secret and that Defendant are using such trade secret as a result of discovery by improper means." NYWC, Inc. v. Pro Beauty Concepts, Inc., 2014 NY Slip Op 50546 - NY: Supreme Court 2014.

86. During CBL's and CLP's respective fundraising activities in 2014, 2015 and 2016, CBL and CLP provided various investors with confidential, proprietary information relating to CBL and/or CLP.

87. Upon information and belief, agents or associates of the BIG3 founders were present at one or more investor meetings relating to CBL or CLP.

88. Upon information and belief, it was during such meetings that the BIG3's founders utilized confidential information, strategy and proprietary business information learned in the context of CBL or CLP investor presentations to form the basis for the BIG3 basketball league and developed at great cost and expense.

89. The misuse of such information constitutes an unlawful commercial exploitation of the proprietary and confidential information of CBL and CLP.

90. Such misuse of the confidential and proprietary information of the CBL and CLP has resulted in damage to the business and originally business prospects of CBL and CLP as stated to various potential and actual investors in CBL and CLP, in an amount not less than $100 million.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR

## FRAUD/FRAUD IN THE INDUCEMENT

91. Plaintiff restates and realleges paragraphs 1 through 90.

92. To plead a cause of action for fraud, a plaintiff must plead a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, as well as justifiable reliance of the other party on the misrepresentation or material omission and such reliance has resulted in injury. Orchid Constr. Corp. v. Gottbetter, 89 AD3d 708 [2d Dept. 2011].

93. As stated above, the BIG3 entered into agreements and made promised to the CBL and CLP pursuant to the February 2017 Agreements.

94. Upon information and belief, the BIG3 never had the intention of honoring any of its agreements pursuant to the February 2016 Agreements.  This information is initially determined by the CBL through discussions in August 2017 with players who played with the BIG3 and who have indicated that they were told by the BIG3 as early as April 2017 that the BIG3 did not intend to cooperate with the CBL.

95. By soliciting the agreements of the CBL in February 2017, the BIG3 was engaged in a calculated, devious plan to attempt to eliminate a potential competitor from engaging in activities that the CBL was originally intending to do and had previously announced in

the summer of 2017.  Instead, the BIG3 sought agreements with the CBL and CLP under

the guise of mutual benefit, in order to induce the CBL and CLP to slow down or halt its

business activities in order for the BIG3 to monopolize the media and markets for

themselves and the BIG3's co-venture partners.

96. The BIG3 then attempted to further perpetuate its fraudulent actions by re-interpreting,

after signing, contracts it had with the BIG3 as prohibiting any basketball activities, not

just 3 on 3 basketball, but to also include participating in any activities relating to the

CBL.

97. The actions of the BIG3, constituting fraud and fraud in the inducement, caused damages

to the CBL and CLP in an amount not less than $50 million.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR

## UNJUST ENRICHMENT

98. Plaintiff restates and realleges paragraphs 1 through 97.

99. To establish unjust enrichment, the plaintiff must show that the defendant was enriched,

at the plaintiff's expense, and that it is against equity and good conscience to permit the

defendant to retain what is sought to be recovered (Georgia Malone & Co., Inc. v Rieder,

19 NY3d 511, 516 [2012]).

100.   The BIG3's unlawful actions, as described above, has resulted in widespread publicity

and value-added to the BIG3's business and business prospects which have been derived

almost entirely ill-gotten gains and at the expense of the CBL and CLP.

101.   Such gains and value to the BIG3 have been unjustly obtained and thus the BIG3 has

been unjustly enriched.  Accordingly, the CBL and the CLP seeks to divest the BIG3 of

these unjustly obtained gains and return them to the rightful owners which are the CBL and the CLP.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR

## UNFAIR COMPETITION

102.  Plaintiff restates and realleges paragraphs 1 through 101.

103.  The BIG3's unlawful misappropriation of CBL's labor, skill, and commercial advantage by exploiting proprietary information belonging to CBL was done in bad faith and allowed the BIG3 to take a windfall in revenue and publicity.

104.  Due to the BIG3's misappropriation of CBL's commercial advantage, CBL has been unfairly damaged in its business and its reputation.

WHEREFORE, Plaintiff demands judgment against Defendant Big3 as follows:

I.      On the First Cause of Action, judgment against the Defendant in the sum of Fifty Million Dollars ($50,000,000), together with interest, costs, and disbursements;

II.     On the Second Cause of Action, judgment against the Defendant in the sum of Fifty Million Dollars ($50,000,000), together with interest, costs, and disbursements,

III.    Alternatively, on the Third Cause of Action, judgment against the Defendant in the sum of Fifty Million Dollars ($50,000,000), together with interest, costs, and disbursements.

IV.    On the Fourth Cause of Action, judgment against the Defendant in the sum of Fifty Million Dollars ($50,000,000), together with interest, costs, and disbursements.

V.     On the Fifth Cause of Action, judgment against the Defendant in the sum of Fifty Million Dollars ($50,000,000), together with interest, costs, and disbursements,

VI.     On the Sixth Cause of Action, judgment against the Defendant in an amount to be determined at trial, together with interest, costs, and disbursements.

VII.    On the Seventh Cause of Action, judgment against the Defendant in an amount to be determined at trial, together with interest, costs, and disbursements.

VIII.   Granting to plaintiffs such other and further relief as this Court deems just and proper, including interest, attorney's fees, costs and disbursements, punitive damages and injunctive relief.

Dated: New York, New York
       September 1, 2017

                                        Wesley J. Paul, Esq.
                                        Paul Law Group, LLP
                                        Attorneys for Plaintiffs
                                        902 Broadway, 6th Floor
                                        New York, New York 10010
                                        (646) 202-2532

# VERIFICATION

State of ____NJ____ )

County of ____NJ____ )

      CARL GEORGE, being duly sworn, deposes and says that he is the ____CEO____ of CHAMPIONS LEAGUE, INC. and the ____CHAIRMAN____ of CHAMPIONS LEAGUE PARTNERS, LLC, Plaintiffs in the within action; that he has read the foregoing Summons and Complaint and that he knows the contents thereof to be true to deponent's own knowledge and the books and records of each CHAMPIONS LEAGUE, INC. and CHAMPIONS LEAGUE PARTNERS, LLC, except as to those matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

                                              Carl George

Notary Public

EDWARD K XU
NOTARY PUBLIC-STATE OF NEW YORK
No. 01XU5038275
Qualified in New York County
My Commission Expires 01-23-2019